SUN CO. v. HEALY.

(Circuit Court of Appeals, Second Circuit.   May 22, 1908.)

No. 256.·

SHIPPING—LIABILITY OF VESSEL FOR DAMAGE TO CARGO—HARTER ACT—FAULT IN MANAGEMENT OF VESSEL.

> Damage to a cargo of molasses, through its dilution by sea water while being pumped out at the port of destination, *held* to have been due to a sea valve connecting with one of the pumps having been left partially open, which was a fault in the management of the vessel, from liability for which the owner was protected by Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946); it being affirmatively shown that the valve was in good condition and that it was properly closed when the cargo was loaded and at the commencement of the voyage.
>
> [Ed. Note.—Statutory exemptions of shipowners from liability, see notes to Nord-Deutscher Lloyd v. Insurance Co., 49 C. C. A. 11; Ralli v. New York & T. S. S. Co., 83 C. C. A. 294.]

Appeal from the District Court of the United States for the Southern District of New York.

Wallace, Butler & Brown, for appellant.

J. Parker Kirlin and Charles R. Hickox, for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge.   The libelant chartered the respondent's steamer Toledo for two voyages with cargoes of molasses of from 425,000 to 475,000 gallons from Guanica, Porto Rico, to New York. The respondent, under an option in the charter party, substituted the steamer Paraguay, constructed to carry liquid cargo in bulk in six separate tanks on each side.   On the second voyage, which is the one in question, the master signed a bill of lading for 473,968 gallons, more or less, all on board to be delivered.   The molasses was run from a large storage tank near the shore at Guanica, first into No. 1 port and starboard tanks nearest the bow, and afterwards into Nos. 2, 3, 4, and 5 tanks running aft on each side; No. 6 tank being empty. The cargo was loaded by the shore pumps.   While loading a weeping rivet was discovered in the No. 1 starboard tank, which, though admitted to be negligible, caused the charterer's agent to direct that the molasses be pumped out of it into No. 1 port tank.   It had received only a comparatively small amount of the molasses, estimated by one witness as about 2 feet from the floor of the tank and by others as about·4 feet; the tank having a depth of 12 feet.   During the voyage to New York some molasses was pumped from No. 1 port tank in No. 6 starboard tank for the purpose of giving the vessel a better trim.

When the steamer arrived at Hoboken, where her cargo was to be pumped into a storage tank, and before discharging had begun, samples were taken from each tank.   The charterer, finding the molasses in No. 1 port and in No. 6 starboard to be thin, directed that it should be discharged into barrels after the cargo in the other tanks had been discharged into the storage tank, which was done.   It is

said that No. 1 port tank contained molasses 2 feet 5 inches deep, No. 6 starboard 2 feet 3½ inches, and that it was all, amounting to about 10,000 gallons, thin. Tanks 2, 3, 4, and 5 were quite full, and the samples from them showed the molasses to be heavy. The discharge of the tanks containing the heavy molasses began June 21st at 2 p. m. The superintendent of the storage company found, as he thought, that the molasses running into the tank was thin. He attributed this at first to the heat and various other causes. At a little after 5 p. m. he reported to the office that 3 feet of molasses had been discharged into the storage tank, which would have been at the rate of about 20,000 gallons an hour. The office replied that this was impossible and that something must be wrong. Accordingly at 6:50 he ordered the pumps to be stopped and the molasses valves closed. An examination of the sea valve showed that it was screwed hard down. The drain pipe of the starboard pumps showed a leakage of molasses thinner than the molasses in the tank. If the sea valve had been then open, the sea water would have been running through, which it was not. The sea valve was then opened, the valve and pumps flushed out, the sea valve closed again, and at 8:45 the discharge of cargo recommenced. The molasses delivered was then found satisfactory by the superintendent and no further complaint was made. At the time the complaint was made the second engineer said that some one must have left the sea valve open, though no one found it open.

Molasses being a sticky fluid, the output is always less than the intake; but in this case the output was considerably larger than the quantity named in the bill of lading. This libel is filed by the owner of the vessel to recover the freight. The answer sets up several defenses, only one of which is material and relied on at this stage of the case, viz., that the sea valve was not entirely closed, whereby water was admitted to the starboard pump and a large portion of the cargo diluted and damaged. The sea valve itself was in perfect order before the voyage began, at the time of the examination above mentioned, and no repair was subsequently made to it. The testimony from the ship is most positive that the valve had been closed before cargo was loaded at Guanica, and had been tried and found closed before the discharge of cargo began at New York. The proofs also show that the officers and men connected with the valve and the pump were competent and had been engaged with due care. In our opinion the vessel owner is protected for damage to the cargo arising from the opening of the sea valve by section 3 of the Harter act (Act Feb. 13, 1893, c. 106, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), unless it be found that the valve was open before the loading of the cargo began and remained open until the defect in the molasses delivered had been discovered. This section protects the vessel owner alike, whether he is acting as a bailee or as a common carrier.

It is contended that the sea valve must have been open when the cargo was loaded, because the molasses which was pumped at Guanica from No. 1 starboard into No. 1 port tank, and at sea from No. 1 port into No. 6 starboard, was on arrival found to be thin. Only the

163 F.—4

starboard pump is complained of, and, as the molasses from No. 1 port to No. 6 starboard was pumped by the port pump, the only leaking that could have occurred, even with the sea valve open, would have been while pumping what was apparently a small quantity from No. 1 starboard into No. 1 port tank. Both pumps were overhauled at sea. If the sea valve of the starboard pump had been open when this operation was going on, the sea water would have poured out of the pump into the pump room. The testimony is absolute that no such thing happened; and it seems certain that, if it had happened, the engineers would have then closed the sea valve, so that no water could have got into the pipes when the cargo was discharged at Hoboken. Therefore we do not believe that any difference of thickness in the molasses in No. 1 port and No. 6 starboard tanks was due to the fact of the sea valve being partly open.

Still we are convinced that between 2 and 6:50 p. m., June 21st, while the cargo was being discharged at Hoboken, the sea-valve connection with the starboard pump must have been open. This may have happened through negligence in not closing it when it was examined before the discharge began. If so, the act was committed in the management of the vessel, within the third section of the Harter act; and the protection of the act is not confined to the voyage, but extends to the final delivery of the cargo. The Glenochil [1896] Prob. 10. The sea valve was an appliance of and a part of the vessel. When the cargo began to be discharged, the molasses came in direct contact with the valve; but the valve was not used to discharge the cargo. Any act done to the valve was as much management of the vessel as would have been an act done to the engines, boilers, anchors, or compass, resulting in injury to the cargo. We find nothing in the case of The Germanic, 196 U. S. 589, 25 Sup. Ct. 317, 49 L. Ed. 610, to the contrary.

But it is said that the specific gravity of molasses, compared with water, being 12 to 8, and the molasses in the tanks being higher than the water outside the ship, the molasses would have flowed into the sea, if the sea valve were open, instead of water entering the ship. While molasses is heavier than water, it is a sticky material, and in a pipe of the diameter of eight inches the friction might, for all we know, more than make up for the difference in the specific gravity. At all events, we are satisfied that sea water was pumped into the ship through the valve, that this happened in accordance with the laws of nature, whether we understand exactly how or not, and that the vessel owners are protected from liability by the Harter act.

The decree is affirmed, with interest and costs.