## THE MAINE.

## THE MANHATTAN.

(Circuit Court of Appeals, Second Circuit. May 19, 1909.)

No. 229.

1. COLLISION (§ 95*) — STEAMER AND TUG WITH TOW — CHANGE OF COURSE WITHOUT SIGNAL.

A steam lighter, proceeding up the East River on the Brooklyn side with a barge in tow, *held* solely in fault for a collision between her tow and a steamer coming down the river, caused by her turning across the river in front of the steamer without having signaled her intention, and for stopping directly ahead of the steamer when her signal, given after she changed her course, was not answered. The steamer *held* not in fault for failing to sooner reverse, where she had already stopped her engines, and a reversal did not appear necessary until too late to prevent the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

Signals of meeting vessels, see note to The New York, 30 C. C. A. 63.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. SHIPPING (§ 140*)—LIABILITY FOR CARGO LOST—CONTRACT FOR EXEMPTION BY PRIVATE CARRIER.

A contract by a lighterage company to carry the product of a manufacturing company in and about New York Harbor, furnishing the full capacity of its vessels, made it a private carrier; and a provision of its contract that it should not be liable for goods ·lost or damaged, but requiring the owner to insure against such loss, is valid.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 493; Dec. Dig. § 140.*]

Appeal from the District Court of the United States for the Southern District of New York.

For opinion below, see 153 Fed. 635. See, also, 161 Fed. 401.

Kneeland & Harison (Lawrence Kneeland, of counsel), for libelant.

Wing, Putnam & Burlingham (Charles Burlingham, of counsel), for the Maine.

Carpenter, Park & Symmers (Samuel Park, of counsel), for the Manhattan.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

PER CURIAM. The libelant delivered to the barge Abram Collerd, owned by the Commercial Lighterage Company, a cargo of pig lead and boxes of vitriol, to be towed by the steam lighter Manhattan, also owned by the same company, from Perth Amboy to the Joy Line Pier, East River. A little above the Brooklyn Bridge a collision occurred between the Collerd and the steamer Maine, which was coming down the river, as a result of which the barge and cargo sank. The libelant, owner of the cargo, but acting on behalf of the underwriters, who have paid its claim, brought this action in rem against the Manhattan and the Maine to recover its cargo damage. The district judge found both vessels at fault, directed a decree for half the damages against the Maine, and dismissed the libel as to the Manhattan.

The Manhattan, coming up river on a flood tide, kept over towards the Brooklyn side, so as to have ample space to round to at her destination, the Joy Line Pier on the Manhattan shore. There was no fault in this; but so long as she held this course on the Brooklyn side she conveyed the impression to all vessels which might encounter her that she was bound up river and that she would pass such as were navigating further out than herself on her port hand. She had no right to depart from this apparent course, and to head to the westward (for Manhattan) across the bows of a ·downcoming vessel, unless she had first signaled her intention to make such a change of course and had received the assent of the other vessel, which by such assent would promise to co-operate. Her witnesses admit that she starboarded, not only before she received any assenting signal, but even before she blew her own two blasts. This was an obvious fault, as the district judge finds, and it was undoubtedly the fundamental cause of the collision. Had the Manhattan not undertaken to deviate from the rule which required her to pass on the port side of the Maine, they would have passed in safety. For this fault the Manhattan was rightly condemned. It is probable that, if she had kept on the new course with-

out checking her speed, she would have crossed the bows of the Maine without being hit. She stopped broadside in front of the latter, because she heard no answer to her two-blast signal; but that circumstance does not excuse her. By changing course before assent was received, she had moved so far in the new direction that a belated effort to hold back only precipitated the catastrophe.

We think, however, the libel was properly dismissed against the Manhattan because of the contract between the Commercial Lighterage Company and libelant under which the goods were carried, the material provisions of which are as follows:

"Sixth. The lighterage company is to be held responsible for the full actual value of all material short-delivered at Perth Amboy or in New York Harbor, unless such short delivery is caused by fire or perils of the sea. It is understood however, that the lighterage company is responsible for all receipts given and taken by their barge captain in the dealings with steamship lines, consignees, or the shipping plant. Insurance will be effected by the smelting company at their expense, and no underwriter claiming through the smelting company is to have any claim upon the lighterage company, or upon their equipment or boats that they may charter or control, in case of loss. Should the smelting company fail to effect the necessary insurance, no claim for such loss will be made upon the lighterage company owing to such failure; neither will the lighterage company be held liable for any such loss, no matter how occurring, because of the failure of the smelting company to insure. * * *

"Ninth. All rates mentioned shall include the hiring of all barges, necessary tools, and equipment, and towing, also the shifting to and between different deliveries, and the rate shall cover deliveries at docks. * * * "

As to the faults alleged against the Maine: The district judge found that there was delay in answering the Manhattan's two-blast signal. We do not think the testimony warrants such a finding. The witnesses from the Maine all testify that they answered promptly with a like signal. If the witnesses from the Manhattan had testified that this answering signal was delayed, there would be a conflict of testimony; and the conclusion of the district judge, who heard the witnesses testify, as to their credibility, would be of great weight. But the witnesses from the Manhattan, including the master of the Confidence, do not so testify. They insist that the Maine did not answer the two-blast signal at all, or that they did not hear any answer. The master of the Lancaster, which with car floats was "very near abreast of the Maine" at that time—a disinterested witness—stated positively that she not only answered his own two-blast signal, but also blew another one, which was undoubtedly her answer to the Manhattan, although the witness did not notice the latter's signal, and the district judge accepts his statement as correct. In the face of this testimony we do not think that the Maine can be held in fault for not answering promptly.

The charge that the Maine was in fault for her position in the river is satisfactorily disposed of by the district judge.

As to the speed of the Maine: That she exceeded the statutory rate in the upper part of the river, or was going hooked up when she found the river comparatively clear as she rounded Corlear's Hook, is not material. Her witnesses all testify that her speed reduced as she found the river congested below that point, and we do not think the testimony of chance observers located on the Manhattan piers is sufficient-

ly persuasive to induce a rejection of their evidence. The real question is whether she stopped and reversed in time. As to stopping her engines, the testimony of her witnesses that they were stopped before she received the two-blast s.gnal from the Manhattan is corroborated by the engine room log, which shows that they were stopped two minutes before the order was given to reverse. And the position of the schooner, which was the nearest source of danger at the time, makes it highly probable that this had been done. It seems to be the universal opinion that, had the Manhattan not checked her speed (as she did because of her failure to hear the assenting signal), she would have passed in safety; the reduction of speed effected merely by keeping the engines of the Maine stopped giving her sufficient clearance. It seems to us that the Maine was not bound to do more, nor bound to reverse and thus increase the margin of safety, until she was in some way advised that the Manhattan was not proceeding on her new course as it was to be expected she would, and that for that reason the margin of safety already secured by stopping would not be sufficient. But from all the testimony in the case it seems clear that the schooner, which suddenly shifted her course, and whose sails were thus interposed between the two approaching vessels, blanketed the Manhattan, so that her stopping could not be observed on the Maine. As soon as that obstruction was removed, the Maine promptly reversed full speed; and in view of the initial fault of the Manhattan in undertaking to navigate otherwise than as the rules prescribed, we are not prepared to hold the steamer in fault for not reversing before the necessity for so doing became apparent.

The decree is reversed, with directions to the District Court to enter a decree dismissing the libel against both vessels, with costs of both courts to each.