THE HAMILTON.

(District Court, E. D. Virginia. March 17, 1914.)

COLLISION (§ 105*)—STEAMSHIP AND TOW MEETING—VIOLATION OF NARROW CHANNEL RULE—LENGTH OF HAWSER, ETC.

A collision in the Elizabeth river at night between a steamship passing out from Norfolk and car float in tow of a tug coming up the river *held* due solely to the fault of the steamship, which, as the free vessel, was bound to keep out of the way, in that she was in the west side of the channel, in violation of article 25 of the Inland Rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), and that, although when the passing signals were exchanged the red light of the car float, which had sagged to the eastward because of the wind, was to the starboard of the steamship's course, she kept her speed of 12 miles an hour until it was too late to avoid the collision. The tug *held* not in fault because of using too long a hawser, which did not result in obstructing the channel nor otherwise contribute to the collision.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 105.*]

---

In Admiralty. Suit for collision by the New York, Philadelphia & Norfolk Railroad Company against the steamship Hamilton, the Old Dominion Steamship Company, claimant, with cross-libel. Decree for libelant.

Thomas H. Willcox and Floyd Hughes, of Norfolk, Va., for libelant. Loyall, Taylor & White, of Norfolk, Va., for respondent.

WADDILL, District Judge. This is a case of a libel and cross-libel to recover damages growing out of a collision between a car float of the libelant company, and the steamer Hamilton, which occurred about 8 o'clock on the night of the 30th of January, 1909, in the waters of the Elizabeth river, a short distance below Boush Bluff Lightship. The car float was one of the libelant's fleet of barges used for freight transportation between Norfolk and Cape Charles, Va; and at the time of the collision was in tow of its tug Delmar, en route from Cape Charles to Norfolk, loaded with some 20 railroad freight cars. The Delmar was a powerful tug, 122 feet 3 inches long, 26 feet 9 inches beam, 11 feet 7 inches deep, gross tonnage 294. The car float was a strong and heavily built barge, about 325 feet long, 45 feet beam, with four tracks to carry 30 cars, and at the time of the collision was being towed on a hawser 125 fathoms long. Both the tug and barge were in first-class condition, and properly equipped with the latest and most approved appliances, and manned by competent officers and crew. The Hamilton, one of the fine passenger and freight steamers of the Old Dominion Steamship Company, used on its line between New York and Norfolk, 351 feet 8 inches in length, 42 feet beam, 17 feet deep, 2,340 gross tons, was also properly equipped and manned and was en route from Norfolk to New York. At the time of the collision, the tide was ebb, and the wind blowing a strong gale from the west northwest. The Hamilton struck the barge about the center of its bow or forward end, and penetrated into the float 10 or 12 feet, and threw 4 or 5 cars overboard. The bow of the Hamilton was also considerably injured.

A few months after the collision, to wit, on the 30th of April and 1st of May, 1909, a trial was had, and for various reasons the final argument was postponed for about four years, when written briefs were filed, and the case submitted for consideration.

Sundry assignments of fault are alleged by the vessels one against the other, but the case really turns upon the question of how far each vessel was observing the rule of navigation determining their location in the channel at the time, and whether they were each conforming to the rule governing them in meeting and passing each other in the narrow channel being navigated.

The court has given much thought and consideration to these questions, and will dispose of them in the order indicated.

First. Article 25 of the Inland Rules of Navigation in terms prescribes that:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

The Delmar insists that it was strictly adhering to this rule, and that for some time prior to, and at the time of the collision, with a high wind directly on its starboard side, it had been navigating outside of the line of buoys marking the westward side of the channel, and that its tow, though tailing considerably to leeward because of the force of the storm, was nevertheless in the western portion of the deep-water channel, which at the point of the collision was some 700 feet wide for the navigation of vessels of the draft of those in collision, and she seeks to demonstrate her contention by the location in the channel of a freight car loaded with coal, thrown by the impact over the bow of the barge. The Hamilton, on the other hand, claims that the collision occurred to the eastward of mid-channel, and that she was navigating in that portion of the channel at the time of the accident.

After careful consideration of the testimony bearing upon this conflict between the parties, the conclusion reached by the court is that the evidence strongly preponderates in favor of the Delmar's contention that the collision occurred approximately in mid-channel. The location of the wrecked coal car almost conclusively establishes this fact, and the same is strongly supported not only by the libelant's testimony, but also by that of the steamship. It is quite apparent, taking the testimony of those in charge of the navigation of the Hamilton, particularly of her master, first officer, and quartermaster, that she was navigating immediately preceding the collision, certainly in the middle of, if not to the westward of, mid-channel. These officers, particularly the ship's master, Capt. Boaz, now deceased, a highly reputable navigator of 30 years' experience, as master of this class of ship, who testified fully and with commendable frankness, make it manifest not only that the Hamilton was not complying with the rule of navigation above referred to, but that he paid little heed generally to the same in passing down this channel; Capt. Boaz's statement being that he preferred to navigate to the westward, rather than to the eastward of the channel. A strict adherence to this rule of navigation cannot be too strongly impressed upon those navigating this busy and much frequented channel, particularly when, as at the time of this collision, it was entirely safe and practicable so to do.

Second. Coming to the question of fault between the two vessels in attempting to pass each other, consideration should be given to the character of the vessels, the manner in which they approached each other, and the signals exchanged between them at and about the time of the collision. As between the steamship and the tug and tow, the latter was the incumbered vessel, and the burden was upon the free vessel to avoid collision or the risk of collision with the other; and whether this be treated as a "head-on" case under article 18, rule 1, or a "crossing" case, under article 19, the Hamilton, the free vessel, having the barge on her starboard side, should have kept out of the way of the same. The navigators of the Hamilton admit having seen the tug and tow some distance above Boush Bluff, and before meeting the Pennsylvania, which was passed port to port slightly below Boush Bluff. The vessels were approaching head and head, or nearly so (Inland Rules of Navigation, art. 18, rule 1). Both running lights of the

steamer were visible to the navigators of the Delmar, and, after so passing the Pennsylvania, the tug and tow were fully seen and observed coming up the channel, and the two vessels interchanged signals to pass port to port, the tug inaugurating the maneuver, which the Hamilton accepted. The vessels were about half a mile apart at that time, and it is conceded by the ship's navigators that the red light of the tug was bearing upon the port bow of the Hamilton, and the red light of the barge upon her starboard bow; in other words, that the tug and tow was navigating immediately across her stem. With the two vessels proceeding—the Hamilton at 12 knots an hour, approximately, and the tug and tow about 6½ knots an hour—they were certainly within two minutes distance apart at their then speed. The Hamilton, in this position of obvious danger, put her wheel to port, and subsequently hardaported, with the view of carrying out her undertaking to pass port to port, and continued at full speed until, when about abreast of the tug, the ship, as she claims, sheered and ran into and collided with the barge, as indicated. Upon the ship's sheer, or failure to respond to her wheel, she reversed her engines promptly, gave danger signals, and did all in her power to avoid the collision, but without effect. The ship's position is that in the effort to pass the barge, which as she claims was in the eastern portion of the channel, she proceeded too close to the eastern bank thereof, smelled bottom, and as a result the ship failed to respond to her helm, and took the sheer mentioned, bringing about the disaster.

The ship's version cannot be accepted by the court, so as to exempt her from liability. The fact that the accident was caused by the near approach to the eastern bank of the channel, the smelling of the bottom, and consequent sudden sheer, is not borne out by the testimony, especially having regard to the place of collision in the channel. On the contrary, the court thinks it is quite clear that the collision was the result of the Hamilton's failure to properly navigate and give appropriate warning of her movements upon seeing the perilous danger in which she was placed, with the red light of the tug bearing on her port bow, and the red light of the tow bearing on her starboard bow. She should have directed her attention to these conditions earlier; and it was inexcusable on her part to have continued apparently heedlessly and thoughtlessly at full speed until within such close proximity to the obstruction across her course as to be unable to avoid collision therewith. The Hamilton was charged with knowledge of the width of the channel, of the danger of proceeding too close to its banks, and especially so at a high rate of speed, as she would thereby the more quickly smell bottom. Good seamanship required that she should have anticipated these dangers, and in no case should she have taken a chance to pass this incumbered vessel at full speed in the nighttime, without knowing whether there was ample room for her to do so; and she cannot avoid the consequences of the collision, arising from these obvious omissions on her part, nor call upon others, themselves free from fault, to share her losses. The recent case of The Howard Reeder, The Columbia, 207 Fed. 929, 934, 935, 936, 125 C. C. A. 377, a decision of the Circuit Court of Appeals of this circuit, very similar to the one in hand,

contaius a full discussion of the law applicable to this case, and to it, and the authorities there cited, reference is made, as also to the Victory & Plymouthian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519, a decision growing out of a collision in these immediate waters.

Third. This case is in many respects a counterpart of The Jamestown, 114 Fed. 593, a decision of this court, which involved a collision between another ship of the respondent's line and a tug and tow of the libelant, occurring virtually at the identical place of this collision, under almost precise conditions, save that there the tide was flood, and here ebb. The same defense was there interposed by the respondent, as here, that the ship, running at full speed, took a sudden sheer and ran into the car float. The court held then, as now, that this defense was not well taken; but it nevertheless divided the damages for the reason that the tug and tow was not free from fault, as in this case.

The charge of negligence, growing out of the length of hawser used, was there, as here, made; and the court decided, notwithstanding the obvious fault on the part of the steamship, that the tug was in fault also, because of obstructing the channel by the tow with its long hawser at and for some time prior to the accident, and divided the damages. In this case, while the hawser was undoubtedly too long, whether the case be treated as within the purview of section 14 of the act of May 28, 1908, c. 212, 35 Stat. 428 (U. S. Comp. St. Supp. 1911, p. 1244), and the regulations of the Secretary of the Treasury of December 7, 1908, effective February 1, 1909 (the day before this collision took place), still that fact seems in no manner to have contributed to the collision, nor was the channel at any time, or in any manner, because of such hawser, obstructed, and hence the vessel should not be condemned solely on account of the use thereof, however reprehensible it may have been to have used the same, certainly after entering the Elizabeth river.

It follows from what has been said that the collision occurred solely from the negligence of the Hamilton, and a decree will be entered so ascertaining.