ROBERT A. MUNROE CO., Limited, v. CHESAPEAKE LIGHTERAGE & TOWING CO., Inc., et al.

(District Court, D. Maryland. August 26, 1922.)

No. 934.

1. **Shipping ⬅132(3)—Carrier bound to make attempt to discover and explain cause of loss of cargo.**

   Though the owner of a scow did not insure the safety of merchandise loaded thereon, and though the burden rested on cargo owner to show by a fair preponderance of the evidence that its loss through the capsizing of the scow was the result of lack of due care, the owner of the scow was bound to make a real attempt to find out what caused the loss, and to do all it reasonably could to throw light on the reason for the capsizing.

2. **Shipping ⬅132(5)—Evidence insufficient to show capsizing due to collision.**

   In suit by cargo owner for loss when scow overturned after her master had left her in a sheltered slip for the night, evidence *held* insufficient to show any collision causing the sinking.

3. **Shipping ⬅207—Leaving loaded scow unattended not negligence, preventing limitation of liability.**

   Where it was the practice to leave loaded scows unattended, it was not such negligence on the part of the owner of a scow to leave it tied to a wharf unattended at night as prevented it from limiting its liability for loss of the cargo by capsizing to the value of the scow and her pending freight.

4. **Shipping ⬅207—Owner may limit liability for breach of implied of warranty of seaworthiness.**

   An owner of a vessel may limit its liability for the consequences of an implied breach of seaworthiness to the value of the vessel and her pending freight.

In Admiralty. Libel by the Robert A. Munroe Company, Limited, against the Chesapeake Lighterage & Towing Company, Inc., and the Atlantic Transport Company. Libel dismissed as against the Transport Company, and decree rendered for the libelant against the other defendant.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Barry, Wainwright, Thacher & Symmers, of New York City, and Keech, Deming, Kemp & Carman, of Baltimore, Md., for libelant.

H. N. Abercrombie, of Baltimore, Md., for respondent Chesapeake Lighterage & Towing Co.

Lord & Whip, of Baltimore, Md., and Burlingham, Veeder, Masten & Fearey, of New York City, for respondent Atlantic Transport Co.

ROSE, District Judge. In pursuance of an order from the libelant, the respondent the Chesapeake Lighterage and Towing Company, hereinafter called the Chesapeake, sent its scow 424 for a lot of kainit, belonging to the libelant, and then on the recently arrived steamship Victorious. The Atlantic Transport Company was doing the ship's stevedoring, and it loaded the scow with 285 tons of libelant's merchandise. Witnesses differ as to the exact way in which the loading was done, but there is nothing to show or to suggest that any lack of care and skill on the stevedore's part contributed to the subsequent disaster. The libel against the Atlantic Transport Company is therefore dismissed.

The scow was put alongside the ship on the 19th of August, 1920, and by the afternoon of the next day her loading was complete. Thereupon she was moved across the slip and placed against a pier in such position that there was room to have put a scow between her and the water end of the pier, while there was considerable distance between her and the shore line. Between 8 and 9 in the evening her master left her and went home for the night. He says that, just before his departure, he went over her and found her dry and in good condition in other respects. A tug of the Chesapeake claims to have passed the mouth of the slip shortly before 11:50, and she then appeared to be upon an even keel, so far as could be determined, without a closer inspection. Less than three hours later, and in the neighborhood of 2:30 a. m., the same tug found her floating bottom up, with a considerable portion of her hull above the water. Her cargo was a total loss. According to the story of the tug's master, some railroad workmen on one of the piers bounding the slip told him that the scow had turned over a few minutes before.

The Chesapeake offers testimony that the scow was seaworthy, and there is nothing to the contrary, except that on a quiet summer's night, in a sheltered slip, she turned turtle. It produces witnesses who made a survey of her after she had been righted and gotten upon a marine railway. They testify that they found injuries to one of her corners extending well below the water line, and which they do not think could have resulted from her upsetting, but which could have been caused by some heavy moving object striking her, and in their judgment were.

Affirmative testimony there ends. If the account of the tug's master be accepted as to what was told him, it is probable that there were eyewitnesses to her capsizing. None of them have been produced. Not a single person of the several who were on the pier that night has been put upon the stand. The Chesapeake's defense rests upon what it claims the survey reveals, and yet it never gave the libelant

notice that one was to be held. It never seemed to feel that it was under obligation to make anything other than the most perfunctory inquiries into what had happened, nor to put the court in possession of all the little that it knew. Even the master of the tug, who says he saw the scow some hours before she capsized, and also a few minutes after, was not examined as a witness until I had from the bench almost insisted that he should be. It is true that he was at the time confined to his home in consequence of an injury to his foot, but there was not the slightest difficulty in obtaining his deposition so soon as anybody tried to get it. There were several other persons on the tug that night, and although all other than he were then out of the Chesapeake's employ, it did not appear that they could not have been readily found, if they had been wanted.

[1] One who, like the Chesapeake, has charge of another's gear, does not insure its safety; but it is bound to do all that it reasonably can to throw light on the reason why it is not able to return that which was committed to its keeping. In other words, in the language of the authorities, it is bound to explain why it does not give back that which it had received, nor is it going too far to insist that it shall have made a real attempt to find out what had happened when it, rather than its bailor, was in a position to do so. It is true that, after all the discoverable facts are in evidence, the burden rests upon the bailor to show by a fair preponderance of the evidence that the loss was the result of a lack of due care upon the part of the bailee.

[2] The Chesapeake says that the instant case is on all fours with that of The Jay St. Terminal No. 3, 281 Fed. 279, recently decided by the Circuit Court of Appeals of the Second Circuit, and it doubtless is, if the trier of fact feels that the weight of the evidence shows that something ran into the scow after her master had left her for the night and before her overturn. No suggestion is made of any occasion which any craft other than the Chesapeake's own tug could have had in that slip that night. Men were at work on the adjoining pier; if anything came into the slip, they might, and doubtless would, have seen it. They in all probability saw the scow at intervals, and may well have noted about when she began to list, a fact which might not have been destitute of evidentiary value. They were not produced, and nothing approximating a real effort to get them has been shown. The libelant was given no opportunity to be represented in the survey, and in fact did not know until afterwards that one had been made. If the Chesapeake at the time really believed there had been a collision, it is hard to understand why it did not make a much more earnest effort than it did to discover the identity of the offending vessel. It or its underwriters were vitally interested in doing so, even if it thought that its policy covered libelant's goods, so that the latter was protected in any event, which is the explanation now given for the failure to let the libelant know that there was to be a survey.

[3] Upon the facts of the case, I must reject the collision theory. If the scow did not sink in consequence of being struck by some other boat after her master left her, she must have turned over because of some defect in her; that is to say, in consequence of her unseaworthi-

ness. It is not pretended that anything struck her before his departure; but, if it had, to have then left her with no one to look after her pumps would have been negligence of an aggravated character. But, if these findings require a holding that the Chesapeake is liable, may it limit its liability? The libelant answers, "No," and cites Boston Towboat Co. v. Darrow Mann Co., 276 Fed. 778, in which it says that the Circuit Court of Appeals for the First Circuit determined that it is negligence to leave a loaded scow unattended, and that when the practice of the scowmen to do so is known to the executive officer of the owner of the scow, as in the case at bar it admittedly was, it may not limit its liability.

On the other hand, the Chesapeake insists that it was under no obligation to keep any one upon the scow, and that the custom of the port did not require it when loading or unloading was not going on, and when the scow was safely tied to a wharf. Two of the cases upon which it relies, The Banner (D. C.) 225 Fed. 433, and the Kathryn B. Guinan, 176 Fed. 301, 99 C. C. A. 639, are not precisely in point. The controversy in each of them was not between the barge and the owner of the cargo, but between the former and another vessel, injured in one case by the barge breaking adrift, and in the other by its turning over; but much of the reasoning of the opinions goes far to sustain the respondent's contention, and in The Jay St. Terminal No. 3, in which a cargo of coffee was damaged, it was not held negligent for the only man on board to be sound asleep in his bunk.

There is much to be said for and against either the rule prevailing in the First circuit or that which is followed in the Second. The question involved is more one of business policy than of law. In the First circuit, those chiefly concerned seem to be of opinion that some one should always be on board these barges, and the barge owners pay at least lip service to the locally accepted judgment by making rules forbidding the leaving of the barges, although one of them at least habitually winked at their violation. In New York it seems to be thought that such requirement would in the long run cost more than it would be worth. There was not much testimony in this case as to what was the Baltimore practice, but there was no contradiction of what there was, and it was to the effect that scows when loaded were habitually left unattended. Upon this state of the record I am not prepared to hold that the mere fact that the Chesapeake allowed its scowmen to go home at night was negligence.

[4] There is nothing in the evidence to show that the Chesapeake had any reason to suspect the barge was unseaworthy, and while it cannot escape liability for the consequences of the unseaworthiness in fact, there is no reason why it may not limit its liability to the value of the scow and her pending freight; it being the rule in this district at least, that the owner may, under proper circumstances, limit its liability for the consequences of the breach of an implied, although not of an express, warranty of seaworthiness.

A decree in accordance with these views may be presented for signature.