## In re STEAMSHIP COMPANY NORDEN.

## THE NORDHVALEN.

(District Court, D. Maryland. June 26, 1925.)

1. **Shipping ⊗⟩101—Ship chartered to carry full cargo for shipper not common carrier, but bailee for hire.**

A ship chartered to carry a full cargo for a single shipper is not a common carrier, but a bailee to transport for hire, bound only to exercise reasonable care, and the mere fact of a loss does not throw upon her the burden of proving seaworthiness, or want of negligence, or that the loss occurred from a cause excepted in the contract, though she is bound to ascertain and disclose all the facts she reasonably can which may throw light on the cause of the loss.

2. **Collision ⊗⟩105—Collision held due to fault or error in navigation.**

A collision *held*, on the evidence, not due to unseaworthiness of the ship in fault, but to faulty navigation.

3. **Shipping ⊗⟩53—Charter of ship as private carrier may limit owner's liability.**

A provision of a charter of a ship as a private carrier, exempting her from liability for loss of cargo through collision, is valid, and under such provision and section 3 of the Harter Act (Comp. St. § 8031) the ship is not liable for such a loss, if it did not result from want of due diligence on the part of the owner, and if he exercised due diligence to make the vessel in all respects seaworthy and properly manned and equipped.

In Admiralty. In the matter of the petition of Steamship Company Norden, as owner of the Steamship Nordhvalen, for limitation of liability. Insurer, subrogated to rights of cargo owner, held not entitled to share in fund.

George Forbes, of Baltimore, Md., Robert S. Erskine, of New York City, and Henry L. Wortche, of Baltimore, Md., for owners of the Nordhvalen.

George W. P. Whip, of Baltimore, Md., for Fidelity Phœnix Fire Ins. Co.

John Henry Skeen and Lee S. Meyer and Wallis Giffen, all of Baltimore, Md., for African S. S. Co., owner of the Barracoo.

Janney, Ober, Slingluff & Williams and Robert W. Williams, all of Baltimore, Md., for D. L. Flack & Co.

SOPER, District Judge. On April 6, 1923, shortly before 8 p. m., a calm, clear, starlit night, the steamship Nordhvalen was sunk as the result of a collision with the steamship Barracoo in the Craighill Channel near the mouth of the Patapsco river. The Nordhvalen was bound out, laden with a car-

6 FEDERAL REPORTER, 2d SERIES

go of coal, and the Barracoo was bound in light to ship a cargo of coal at the port of Baltimore. The Barracoo filed a libel against the Nordhvalen, which filed an answer and a cross-libel against the Barracoo. The Nordhvalen was almost a total loss. Much of her cargo was also lost. There was substantial damage to the Barracoo. Proceedings for limitation of liability for damages arising out of the collision were filed by the owners of the Nordhvalen, who surrendered the wreck and the pending freight. The amount in the hands of the trustee to the credit of the cause is $17,500, the distribution of which fund is the subject of this controversy. Claims are filed by the African steamship Company, owner of the Barracoo, for damage, detention, and loss of charter hire; by D. L. Flack & Co., for demurrage on cars which were held up awaiting the repairs of the Barracoo, and by the Fidelity-Phœnix Fire Insurance Company, insurers of the cargo of the Nordhvalen, who are subrogated to the rights of Gano, Moore & Co., the shippers.

There is no dispute as to the right of the owners of the Nordhvalen to limit liability. Nor are the claims of the African Steamship Company and D. L. Flack & Co., contested. The sole question is the right of the Fidelity-Phœnix Fire Insurance Company, the insurers of the Nordhvalen's cargo, to participate in the limitation fund. In other words, did any liability on the part of the owners of the Nordhvalen for the loss of her cargo arise by reason of the collision? The cargo owners base the right to recover on the charge of unseaworthiness of the Nordhvalen, while the owners of the ship claim to be free of liability by reason of exemptions in the charter party, and of the provisions of section 3 of the Harter Act (27 Stat. 445 [Comp. St. § 8031]).

The Nordhvalen, having loaded with coal for St. Nazaire, France, left her mooring in Curtis Bay at a quarter before 6. She then proceeded by the Curtis Bay Channel, the Fort McHenry Channel, the Brewerton Channel, and finally the Cut Off Channel, before entering the Craighill Channel. The last named is 600 feet wide, and is dredged to a depth of 35 feet. The ship's course in the Cut Off Channel was in a general southeasterly direction, and, when she turned the buoy at the junction of the channels, and rounded into the Craighill, she proceeded in a southerly direction. At or about the time when she entered the Craighill Channel she observed the Barracoo, which was then between 3 and 4 miles distant, and about to enter the

Craighill Channel at the lower end. The Nordhvalen was a steamship 330 feet in length, and 41 feet 6 inches beam. The Barracoo was 425 feet in length. Before the Nordhvalen entered the Craighill Channel, she was showing her green light to the Barracoo, while the latter showed her red light to the Nordhvalen. The vessels exchanged whistles of one blast, indicating that they would pass each other, port to port. After the Nordhvalen entered the Craighill Channel, she showed her red light for a short time, but, when she was about midway of the channel and skirting the western bank, she again showed her green light to the Barracoo, took a rank sheer to port, and crossed the channel directly in the course of the latter vessel. Efforts were then made to avert the collision, but it was too late. According to the weight of the evidence, the vessels were not more than two or three ship lengths apart when the Nordhvalen left her starboard side of the channel and sheered across the path of the Barracoo.

The Barracoo struck the Nordhvalen's bow at a point on the starboard side of the Nordhvalen, somewhat abaft of the fore rigging. Both vessels backed away from the collision, and the Nordhvalen then proceeded eastward of the channel, taking a semicircular course to port, and sank in shoal water, with her bow toward the north.

It is obvious under the circumstances that the Barracoo was entirely free from blame. The only inquiry is the cause of the sheer which put the Nordhvalen into the position named. On the part of the cargo owner it is claimed that the Nordhvalen was unseaworthy, because her steering apparatus failed to work; and on the part of the owners of the Nordhvalen and of the Barracoo that the accident was caused by errors or faults of navigation of the Nordhvalen's crew.

The testimony of the crew shows that at or about the time the sheer of the Nordhvalen began her pilot directed the helmsman to port the helm so as to keep her on her own starboard side of the channel. The vessel failed to respond, and a second order of more port was given, and, when this had no effect, the helmsman was ordered to place the wheel hard aport. These orders were executed, but the vessel did not answer her helm, with the result already described. There is some testimony that the sheer was quite gradual, and that the vessel proceeded from one-half mile to a mile from the time it began to sheer until the collision took place, but the weight of the testimony is to the effect that the sheer was rather sudden and pronounced, and that

the vessels were not more than three ship lengths apart when it began.

Testimony was also given by the crew of the City of Norfolk, a bay steamer which was proceeding from Baltimore somewhat astern of the Nordhvalen. The Norfolk's officers indicate that the Nordhvalen was steering a little badly when she rounded into the Craighill Channel, and, since the Barracoo was seen inbound, the faster bay steamer decided not to pass the Nordhvalen until the latter had safely passed the Barracoo. From their testimony it is argued that the steering apparatus of the Nordhvalen was working badly before the sudden sheer took place, but the testimony hardly justifies such a finding. The City of Norfolk, proceeding at the rate of 13½ knots, was overtaking the slower Nordhvalen, which was making less than 6 knots per hour. The channel was only 600 feet wide, and the three vessels were likely to come together in passing, unless the Norfolk's speed was checked. It was the desire to avoid this hazard rather than the bad steering of the Nordhvalen which caused the Norfolk to slow down her engines before the collision. Furthermore, it is conceded that the Nordhvalen had left her dock and had successfully negotiated the several channels above mentioned before reaching the Craighill, and had experienced no greater difficulty in steering than is usual with a loaded vessel in a narrow channel. In short, the testimony to support the conclusion of unseaworthiness rests almost entirely upon the admitted fact that the Nordhvalen did not answer her helm for a few minutes before the collision, and it is suggested, therefore, that the vessel must have been unseaworthy at the beginning of the voyage which had so shortly theretofore begun.

The circumstance is certainly undoubtedly entitled to careful consideration as one of the possible explanations of the accident. On the other hand, it is suggested that the sheer of the Nordhvalen was caused by the negligence of her pilot in carrying the heavily laden ship so near to the bank of a narrow channel that she became unmanageable. Similar accidents were discussed in The Howard Reeder, 207 F. 929, 125 C. C. A. 377; The Hamilton (D. C.) 212 F. 1016; The Monroe C. Smith (D. C.) 201 F. 569; Nicholas Transit Co. v. Pittsburgh S. S. Co., 209 F. 348, 126 C. C. A. 274, and there are circumstances in the case at bar which render it not improbable that such was the cause of the accident in this case. The ship was proceeding at 6 miles per hour—her best speed when heavily loaded. She was sailing close to the bank, according to the testimony of her own pilot, being not more than 40 to 60 feet therefrom. It is not perfectly clear why the first order to port the helm was given, unless it was that the pilot noticed some movement to port. The ship was already close to her own starboard side of the channel. According to the pilot's testimony, the light on the buoy midway on this side of the channel was out. In the nighttime the vessel may very easily have been even nearer to the bank than he realized, so that she was thrown sharply to port from no apparent cause.

This seems the more probable in view of the many changes in the course which had necessarily taken place in the progress of the vessel from her pier at Curtis Bay to the point of collision. Only a few minutes before the collision she had answered her port helm by rounding the turning buoy at the junction of the two channels. A very short time before the collision, when the vessel would not answer the port helm, the helm was put hard astarboard, and the vessel promptly responded thereto. After the impact and separation of the vessels, the Nordhvalen was put full speed ahead in order that she might clear the channel and be sunk in shallow water, and she was maneuvered around so that her bow was pointing northwardly towards the city. These instances indicate that, except for the period during which the sheer took place, the vessel answered properly to her helm both before and after the accident.

On the day following the accident, when the vessel had sunk, but before she had settled, her steering gear was still accessible. It was examined by her officers, and found to be in good shape. Representatives of the Barracoo were also on the Nordhvalen about this time, but they gave no testimony that upon their visit to the sunken vessel any defect in the steering gear was discovered. In December, 1924, after the ship had been raised, it was discovered that the control rod connecting the steering wheel on the bridge with the steering engine aft was broken. At this time, however, the vessel was in lamentable condition, and much of her paraphernalia was missing or injured either by depredations or in the course of her salvage. It was agreed on all hands that the vessel could not have been steered after the collision had the control rod been then broken, and the conclusion is justified that it was not broken until after the vessel was sunk.

The history of the vessel indicates that the steering gear was in good condition. She

was surveyed in 1920 by Lloyd's, and was given the highest rating. Her rudder was inspected and repaired in 1921. In November and December, 1922, some four months before the collision, when the vessel was in the port of Philadelphia, the steering apparatus was carefully gone over, and put in first-rate repair. From that time on the vessel made a voyage to Iquique on the western coast of South America; thence to Charleston, S. C.; then to Mantanzas, Cuba; and finally to Baltimore. During all of these voyages the steering gear worked properly and efficiently. In accordance with the usual custom, dock tests of the steering gear were made at each of the ports mentioned before the vessel sailed, and one was had in Baltimore before her last voyage began. The test consisted of putting steam in the steering engine and turning the wheel back and forth so as to ascertain if all the parts worked properly together. According to the undisputed testimony, these are the usual tests.

No suggestion was made in the testimony that other tests are customarily made, except for the testimony of one expert called on behalf of the cargo owner, who said that it was his custom as an engineer at sea to make a complete examination of the steering apparatus every 5,000 miles. He said that, since the vessel had made about 5,000 miles since the steering gear was overhauled in Philadelphia, it should have been overhauled again before she sailed from Baltimore. Not much emphasis has been placed on this expert testimony, and, since it was limited to the experience of the witness himself, and was not offered as evidence of the practice pursued by careful shipowners, it does not warrant the finding of negligence on the part of the owners of the ship. On the contrary, the weight of the evidence is that the ship owners did all that would be expected of them in the care and upkeep of the steering gear.

One other circumstance may be mentioned as indicating the condition of affairs on board the Nordhvalen before the accident. The testimony of her crew is conflicting, and not altogether comprehensible. The captain was not on the bridge from 6:30 p. m. until a few minutes before the collision. According to him, the vessel never straightened out in the Craighill Channel, and, although she was within 50 feet of the western side, she never showed her red light to the Barracoo. The second mate insists that the Nordhvalen straightened out in the channel, but did not show her red light. Since the Barracoo was on the east side of the channel, this testimony cannot be correct. The helmsman of the Nordhvalen, contrary to all other witnesses on the point, said that, when he put the helm to port as ordered just before the collision, the vessel went to starboard. Had this occurred, the collision would not have happened. According to the captain, the vessel sheered for a distance of a half mile to a mile before the accident, but, according to the pilot, the vessel sheered rapidly from a point much nearer to the place of collision. On the whole, the recital by these witnesses is quite unsatisfactory, and lends color to the theory of negligent navigation of the ship.

The obligation of the ship owner to furnish a seaworthy vessel in this case is clear. The bill of lading, it is true, warrants the seaworthiness only so far as ordinary care can provide, and such a contract may cut down the absolute obligation to furnish a seaworthy ship to the duty to use ordinary care to this end (see the reference to The Laertes, 12 P. D. 187 in The Caledonia, 157 U. S. 124, 136, 138, 15 S. Ct. 537, 39 L. Ed. 644); but the charter party supersedes the bill of lading and governs the shipment (The Fri, 154 F. 334, 83 C. C. A. 205; The G. R. Crowe [C. C. A.] 294 F. 506). The charter party contains the usual recitals that the vessel is tight, staunch, and strong, and every way fitted for the voyage, and thus embodies an explicit warranty of seaworthiness for the breach of which, resulting in loss, the cargo owner may recover.

[1] In weighing the evidence as to whether unseaworthiness was the cause of the collision, it should be borne in mind that the Nordhvalen became a private carrier by reason of its contract to carry a cargo of coal for a single shipper. She was not an insurer of the safety of the cargo, but merely a bailee to transport for hire, and, as such, only bound to use ordinary care. The mere fact of loss did not throw upon the vessel, as would have been the case with a common carrier, the burden of showing that she was seaworthy before she broke ground, and that the loss occurred from one of the causes excepted in the contract of shipment. The Fri, supra; The G. R. Crowe, supra; The Wildenfels, 161 F. 864, 89 C. C. A. 58; The C. R. Sheffer, 249 F. 600, 161 C. C. A. 526; The Lyra, 255 F. 667, 167 C. C. A. 43. The presumption of unseaworthiness or of negligence arising from damage to goods intrusted to a common carrier and discussed in such cases as The City of Camden (C. C. A.) 292 F. 93; The Rosalia (C. C. A.) 264 F. 288; The O. Y. Tonnage v. Texas Co. (C. C. A.) 296 F. 893, does not apply in the case at bar.

The duty of a private carrier or bailee to

explain as far as possible a loss of goods intrusted to its care and the ultimate burden of proof upon the bailor, in accordance with the modern rule of bailments (see 6 Corpus Juris, 1158), is thus laid down by Judge Rose in Robert A. Munroe Co. v. Chesapeake Lighterage & Towing Co. (D. C.) 283 F. 526: "One who * * * has charge of another's gear, does not insure its safety; but it is bound to do all that it reasonably can to throw light on the reason why it is not able to return that which was committed to its keeping. In other words, in the language of the authorities, it is bound to explain why it does not give back that which it had received, nor is it going too far to insist that it shall have made a real attempt to find out what had happened when it, rather than its bailor, was in a position to do so. It is true that, after all the discoverable facts are in evidence, the burden rests upon the bailor to show by a fair preponderance of the evidence that the loss was the result of a lack of due care upon the part of the bailee."

[2] In other words, if there is no preponderance of evidence, and the matter remains in doubt after full disclosure on the part of the carrier, the loss falls upon the bailor for the reason that he has failed to sustain the burden of proof. The importance of the rule as to the burden of proof in admiralty cases in which the cause of an accident is open to doubt is well illustrated by the decisions of the Supreme Court in The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748. The evidence bearing on the cause of the collision in this case has already been discussed: Taking the view most favorable to the shipper, it must be admitted that the cause of the Nordhvalen's behavior is not free from doubt. In the opinion of the court it is not shown by a preponderance of the evidence that the ship was unseaworthy, and the shipper is not entitled to recover on this ground.

If unseaworthiness was not the cause of the collision, it was due to faulty navigation. In fact, faulty navigation is conceded by the ship owner. The question arises whether the ship was exempt from liability for damages for this cause by anything in the charter party or in the Harter Act. Section 7 of the charter party excepts collisions, even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners, or other persons employed by the ship owner, not resulting, however, from want of due diligence by the owner of the ship; and

it was also agreed that the ship should be subject to all the terms and provisions of and all the exemptions from liability contained in the Harter Act. Section 3 of this act exempts a ship and her owner for liability for loss to cargo resulting from faults or errors in navigation or management of the vessel, provided the owner exercises due diligence to make the vessel in all respects seaworthy, and properly manned, equipped, and supplied.

[3] A common carrier cannot by any form of contract exempt itself from liability for the negligence of its own servants, but such a contract on behalf of a private carrier is valid. The Jason, 225 U. S. 32, 32 S. Ct. 560, 56 L. Ed. 969; The Fri, supra; The Maine, 170 F. 915, 96 C. C. A. 131; The Royal Sceptre (D. C.) 187 F. 224. It is also held that section 3 of the Harter Act applies to private carriers as well as common carriers. Sun Co. v. Healy, 163 F. 48, 89 C. C. A. 300. Therefore, by virtue of the contract and of the statute, the ship is exempt from liability for loss caused by collision, if it did not result from want of due diligence by the owner of the ship, and if the owner exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied.

The question of seaworthiness having been already discussed, it must be held that there is no showing that the collision resulted from the lack of due diligence on the part of the owner operating at the time of the accident, and the facts of the case fall within the express exception of section 7 of the charter party, except in so far as it is modified by section 3 of the Harter Act. Under the decisions relative to that section, the burden of proof is on the carrier to show that it exercised due diligence to make the ship seaworthy. The Wildcroft, supra; The Fort Morgan (C. C. A.) 284 F. 1. In the opinion of the court, this burden of proof has been met in this case, and it has been shown that the owner exercised due diligence to make the vessel seaworthy, not only in respect to the steering apparatus, but in all other respects. It might be argued that under the terms of the charter party the ship would be exempt, if it were able to show either that negligence on the part of the owner did not contribute to the collision, or if the owner showed that due diligence had been used to make the vessel seaworthy, and that in any case it is not necessary to prove the absence of negligence in both respects. It is not necessary, however, to decide the point in this case, since

the evidence demonstrates the absence of negligence in both particulars.

It follows that the insurer of the cargo is not entitled to share in the distribution of the funds.