**COLTON v. NEW YORK & CUBA MAIL S. S. CO. et al.**

**Ex parte McCAULEY.**

Circuit Court of Appeals, Second Circuit.
July 17, 1928.

No. 312.

1. **Shipping ⬳143—Steamship company issuing through bill of lading held liable as common carrier for injury to potatoes in lightering them for transshipment.**

Steamship company, issuing a through bill of lading for shipment of potatoes, *held* liable as a common carrier for damage to potatoes resulting from frost when lightering them from

one ship to another, notwithstanding attempt to contract against liability during transhipment, since company, after issuing through bill of lading, could not thereafter contract against such liability.

2. Shipping  ☞141(1)—Steamship company held liable for negligence in lightering potatoes in freezing weather, notwithstanding shipment at owner's risk.

Steamship company, whether or not a common carrier, *held* liable for negligence in lightering potatoes during freezing weather without providing sufficient covering; provision of bill of lading that shipment was at sole risk of owners not covering negligence of carrier.

Appeal from the District Court of the United States for the Southern District of New York.

Receivership proceeding by Wendell P. Colton against the New York & Cuba Mail Steamship Company, wherein John M. McCauley filed a claim. Decree for claimant, and defendant and Henry E. Cabaud, as substituted receiver, appeal. Affirmed.

McCauley, the appellee herein, filed his claim against the New York & Cuba Mail Steamship Company and its receiver in equity for damages to a shipment of Irish potatoes. The matter was referred to Hon. Wallace Macfarlane, as special master, who reported that the claimant should have damages in the sum of $6,189.50 because of the negligence of the defendants. This report was confirmed by Judge Goddard by an order providing for a decree against the steamship company for the above amount, and from that decree the defendants appeal. Affirmed.

Rogers & Whitaker, of New York City (Horace L. Cheyney and William J. Dean, both of New York City, of counsel), for appellants.

Cook, Nathan & Lehman, of New York City (Edgar M. Souza and Louis M. Loeb, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. The claimant purchased, subject to inspection, 3,627 bags of Irish potatoes, which had been shipped on the White Star steamship Regina, and received from his vendor a duly indorsed bill of lading issued by the agents of the New York & Cuba Mail Steamship Company (known as the Ward Line). This document, designated on its face as "New York & Cuba Mail Steamship Line Through Bill of Lading," read as follows:

"Received in apparent good condition from Cullen, Allen & Co., for shipment on board the steamship Regina, now lying in the port of Liverpool and bound for New York, three thousand six hundred and twenty-seven bags of merchandise, * * * to be delivered in like apparently good order and condition at the * * * port of New York * * * unto the New York & Cuba Mail Steamship Company as agents for the owners of the goods for the purpose of entry and of effecting the transshipment of the same by the usual methods of conveyance, at the sole risk of the owners of the goods, at the expense of the carriers, to one of the steamers of the New York & Cuba Mail Steamship Company, and to be conveyed by said steamer and delivered at the port of Havana unto order of Messrs. Wm. Gambel & Co. (New York), or to his or their assigns."

The contract also had stamped on it the clause: "Ship not accountable for damage by frost."

The potatoes reached New York in good order on March 28, 1923, and were discharged by the Regina on an open lighter furnished by the Ward Line on the afternoon of March 28th and during the succeeding night and early morning. The temperature was about 10° above zero and a northwest wind was blowing. Not only was an open lighter unfitted for transportation of such perishable cargo in extremely cold weather, but there seems to have been no sufficient attempt to protect the potatoes on the lighter by properly battened tarpaulins. The only evidence is that of McCauley's associate, Sullivan, who testified that "the tarpaulin cover was just thrown on top; the edges of it were flapping in the wind," and that of Quigley, McCauley's foreman, who said there were "no ropes on the tarpaulin tying it down; just a piece spread over the top; * * * it was not held at all; the wind was blowing it up and down." The testimony of the witness Cole was to the same effect.

The Ward Line had been warned by McCauley against using an open lighter for transshipment in such cold weather, and had said that the open lighter was the only one available, but agreed to cover the lighter with heavy tarpaulins and not to load during the night of the 28th of March. The shipment was exposed during the loading at night, and afterwards uncovered, except for an old piece of tarpaulin, which partly covered the top and was flapping in the wind.

As an inevitable result of such neglect of care of the cargo a substantial portion of it

was badly frostbitten. McCauley examined it at the Ward Line pier and found the good potatoes could not be separated from the bad. The extent of the freezing could not then be determined, and governmental regulation did not permit Irish potatoes to be landed in this country. By the time they had reached Havana the whole shipment was more or less tainted by the potatoes that had been badly frozen. After the potatoes were loaded from the lighter upon the Ward Line steamer Orizaba, they were transported to Havana, where the whole shipment was sold at a loss, as compared with the sound value of $6,189.50. It was sufficiently proved that the claimant made every attempt promptly to dispose of the potatoes to various Havana dealers at a better price, but could get no one but the person to whom he sold to purchase the damaged goods.

The evidence and findings of the master completely dispose of the contention that there was sufficient care shown in the transshipping of the cargo, and also of the contention that there was a neglect on the part of McCauley in selling the potatoes in Havana without separating the worthless ones from the others. The claimant had the burden of proof but amply sustained it in every way. Therefore the only matters for serious consideration are two questions of law:

(1) Was the Ward Line acting as a common carrier in lightering the potatoes?

(2) Was the Ward Line liable for its negligence, whether acting as a common carrier or not?

[1] The contention that the voyage was split up into three stages, and that the obligation of the Ward Line was satisfied by furnishing a proper lighter as agents for the purpose of transshipment, is contrary to the entire conception of a "through bill of lading." The Ward Line issued a through bill of lading, and after doing this proceeded to contract against its liability during transshipment. This it could not do (The Kensington, 183 U. S. 268, 22 S. Ct. 102, 46 L. Ed. 190; Santa Fé R. Co. v. Grant Bros., 228 U. S. 184, 33 S. Ct. 474, 57 L. Ed. 787), and for this reason alone the decree must be affirmed.

The defendants have attempted to distinguish Insurance Company of North America v. North German Lloyd Co. (D. C.) 106 F. 973, affirmed (C. C. A.) 110 F. 420, because there the carrier furnished an unseaworthy lighter, which capsized before the cargo was loaded on the ship. In that case there was a clause in the contract of carriage, "that the carrier shall have liberty to convey goods

27 F.(2d)—43

in lighters to and from the ship, and to discharge into lighters at the risk of the owner of the goods." But the court, in spite of that clause, held, following Bulkley v. Naumkeag Steam Cotton Co., 24 How. 386, 16 L. Ed. 599, that the lighter was simply a substitute for the ship, and the carrier was liable. The decision depended on a finding that the North German Lloyd was a common carrier throughout the service, and had not exercised due diligence to make the lighter seaworthy, so as to come within the exemptions of the Harter Act (46 USCA §§ 190–195). To the same effect is The Seaboard (D. C.) 119 F. 375, and The Ogeechee (D. C.) 248 F. 803. Here the carrier failed to take proper care of the cargo, either by providing a covered lighter, or by waiting until the severe cold abated, or by having sufficient tarpaulins and properly fastening them down. In none of these acts of negligence did McCauley acquiesce. He had to take what the Ward Line furnished, and he showed unusual diligence in giving warning against the dangers that imperiled the cargo.

In Smith v. Booth (C. C. A.) 122 F. 626, also referred to by the defendants, James E. Ward & Co. issued through bills of lading to shippers of a cargo of rice from Liverpool to Havana. By the terms of the bills of lading the rice was to be delivered by the Teutonic unto James E. Ward & Co. at New York, and by them to be forwarded by one of their steamers on the terms of the bills of lading of their company, at risk of shippers. This court held that the through bills of lading embraced obligations of James E. Ward & Co. in three capacities: (1) As initial carriers; (2) as intermediate carriers in making transshipment upon conditions not expressed, but implied from the nature of the undertaking; (3) as ultimate carriers upon conditions to be expressed in further bills of lading.

Ward & Co. employed a lighterage company to transship the rice at the port of New York, which negligently overloaded the cargo, so that it was lost. We there held Ward & Co. liable, without apparently deciding whether they were common carriers, or mere bailees of the cargo, on the ground that they neglected, through their agents, the lighterage company, to use ordinary care. In neither event was the clause "at risk of shippers" considered applicable, because it related only to bills of lading to be issued by the line that was to carry the cargo from New York to Havana, and when the loss occurred no such bills of lading had issued, nor were they to take effect until the rice was

delivered to the Havana steamer. The bill of lading in Smith v. Booth, supra, closely resembled the present one, but the freighter was held liable because, even if not a common carrier, he was guilty of negligence, and the clause exempting him from liability did not apply to the transshipment.

The Wildenfels (C. C. A.) 161 F. 864, relied on by the defendants, is not in point. The opinion indicates no employment of the lighter as a separate step in a through contract of carriage, and the lighter was not herself a common carrier. The Fri (C. C. A.) 154 F. 333, and The Maine (D. C.) 161 F. 401, and (C. C. A.) 170 F. 915, are to the same effect.

It was authoritatively decided in Bulkley v. Naumkeag Steam Cotton Co., 24 How. 386, 16 L. Ed. 599, that when the carriage begins from the lighter's point of departure the lighter is the substitute for the ship, and the liability arises as soon as the lighter receives the goods. We are unable to see how it can make a difference here that the lighter was the second step, instead of the first, in a through contract. Insurance Company of North America v. North German Lloyd, supra.

[2] But, irrespective of whether the Ward Line was a common carrier, the defendants were properly held liable for their own negligence. The words, "at the sole risk of the owners of the goods," in a contract prepared by the Ward Line, which seeks to limit its liability, are to be strictly construed. Smith v. Booth (C. C. A.) 122 F. at p. 628. They do not in terms cover the *negligence* of the carrier, and were not held sufficient to avoid liability in Vitelli v. Cunard S. S. Co. (C. C. A.) 203 F. 697, and The Ogeechee (D. C.) 248 F. 803. Furthermore, as the master said, transshipment in an open lighter, with no adequate tarpaulins, was not "by the usual means" called for by the contract of affreightment.

The decree is affirmed.